MURDOCK, Justice.
 

 This case involves claims by Wilson Lamar Frazier against Core Industries, Inc. (“Core”), under the Jones Act, 46 U.S.C. § 688,
 
 [1]
 
 and also entails consideration of the Longshore and Harbor Workers’ Compensation Act (“LHWCA”), 33 U.S.C. § 901 et seq.
 
 [2]
 
 Frazier appeals from a summary judgment entered by the Mobile Circuit Court in favor of Core. We affirm,
 

 I. Facts and Procedural History
 

 The trial court made the following factual findings, which Frazier does not dispute:
 

 “1. Core is in the business of offloading or unloading materials and equipment from barges and ships to land. [Frazier] began working for Core in late-2003, early-2004. [Frazier] testified that he was hired directly by Morgan Myles and John Watson, employees of Core. [Frazier] also claims that he was an employee of Pinnacle Management Services (‘Pinnacle’). The records on file indicate that Core leased the services of [Frazier] from Pinnacle and that [Frazier] received his paycheck from Pinnacle. Core hired [Frazier] to work as a welder and paid him skilled welder’s pay, which was considerably higher than what Core paid the crews that regularly worked in its offloading operation.
 

 “2. [Frazier’s] first job for Core was ‘[p]utting a tail on a barge’ by welding two sections of a barge together. The barge that [Frazier] was working on was ‘docked up to the side of the dock’ in the Theodore Industrial Canal. The barge was anchored so it would not shift or
 
 *143
 
 move in the water. [Frazier] worked on this project for six to eight weeks.
 

 “3. During the barge construction project, [Frazier] would go home every night after work and would come back in the morning. [Frazier] did not eat or sleep on the barge. The barge did not have a bathroom or living quarters, it was ‘just a plain barge.’ [Frazier] could get on and off the barge simply by using a walkway that connected the barge to the dock. The barge did not have an engine, navigational equipment, or any means of propulsion.
 

 “4. [Frazier] claims that while he was working on this barge, he slipped while carrying a piece of steel onto the barge. [Frazier] alleges that he hurt his back when he slipped and fell on the barge. [Frazier] did not seek medical treatment following the accident and continued to work for Core.
 

 “5. After the barge construction project, [Frazier’s] next project for Core was to repair a crane that had ‘rusted out.’ This repair job was done on land. During this same time frame, [Frazier] also helped Core install certain equipment, including a conveyor, on the barge that he had helped build. When he was installing the conveyor, the barge was ‘spudded down and tied [to the dock].’[
 
 3
 
 ] During this time, [Frazier] was still working during the day and returning to his house every night.
 

 “6. [Frazier’s] next job for Core was building á hopper.[
 
 4
 
 ] [Frazier] helped build the hopper on Core’s dock in Theodore, which is ‘on land.’ This project took approximately a month and a half. [Frazier] then built a new set of spuds for the barge that he had worked on when he first started with Core. This project was also done on land. It took [Frazier] approximately three weeks to complete the spuds.
 

 “7. [Frazier’s] next job for Core was welding new legs on a hopper, which was also done on land. [Frazier] claims that he suffered a second accident while he was welding the legs on the hopper. [Frazier] claims that he had finished with his weld and was looking for a chipping hammer when he accidentally stepped off the end of a scaffold board and fell to the ground. [Frazier] continued working that day and did not seek medical attention as a result of the accident. [Frazier] claims that he injured his back and leg in this accident.
 

 “8. [Frazier’s] next job for Core was changing pipes, hoses, and hydraulic lines on a crane that was on a barge. The barge was anchored at Core’s Sara-land facility. This job took four or five days.
 

 “9. After working on the crane, [Frazier] -next built ramps that would allow dump trucks to pull up to the barges for ease of loading. [Frazier] built the ramps in Core’s mechanic shop in Sara-land. [Frazier] spent three weeks building the ramps.
 

 “10. [Frazier] claims that while he was building the ramps, he had to help shift, one barge down the bank at Core’s facility in Saraland. [Frazier] testified that Core employees used a crane to move the barge and he helped secure the barge when' it was moved to the proper position. The barge that was moved did not have an engine or any form of propulsion, did not have rudders
 
 *144
 
 or keels, and did not have navigational lights.
 

 “11. [Frazier] ordinarily worked from 6:30 a.m. to 3:30 p.m. for Core, with an hour for lunch. [Frazier] did not ordinarily take his meals on a boat and would return to his home every night after work.
 

 “12. While [Frazier] spent some time on barges for Core doing welding tasks such as repairing ramps or fixing hoppers, he was never on a barge when it was being pushed by a towboat and was only occasionally on barges when they were moved with cranes. The farthest distance [Frazier] ever traveled when a barge was being moved by a crane was around 500 yards, which took approximately an hour to move.[
 
 5
 
 ]
 

 “13. While [Frazier] testified that he did some ‘deckhand’ work for Core, he defined a deckhand as a ‘laborer.’ As a laborer, [Frazier] said he would ‘run a shovel,’ grease a crane, or ‘whatever needs to be done.’ Even when [Frazier] was performing ‘deckhand’ duties (as he described them), he was arriving at the job site in the morning and returning to his home at night. [Frazier] never rode on a barge out of town and testified that the barges he worked on were not designed for navigation, they were work platforms.
 

 “14. On one occasion, [Frazier] had to repair the conveyor on a barge that was in Destín. To do this, he loaded his own truck with equipment and drove to Destín. He did not spend the night on the barge. When [Frazier] was working on equipment on a barge that was in an offloading operation, the barge would ordinarily be anchored down with the spuds in the down position, and the barge would also be moored or tied to the dock.
 

 “15. [Frazier] does not hold any maritime licenses. [Frazier] has never worked as a captain or a pilot, and has never worked as a deckhand on a boat in navigation. [Frazier] has never received any navigational training or man-overboard training. [Frazier] has never worked on barge that has been operated by some kind of propulsion, other than a crane moving a barge down the shoreline. Other than the barge that he built when he first started working for Core, [Frazier] was not assigned to any one barge.
 

 “16. [Frazier] would normally report to work at Core’s mechanic shop in Sar-aland. [Frazier] carried some of his own equipment when he worked for Core, which included hand tools, hammers, chisels, safety glasses, a welding hood, burning goggles, gloves, wrenches, and plyers [sic]. Core furnished [Frazier] with a welding machine, welding rods, and a torch and gas.
 

 “17. [Frazier] claims that he had a third accident while working for Core when he was in Gulf Shores helping a co-worker change out a bucket on a crane. Before changing out the bucket, [Frazier] was helping the co-worker, who was operating the crane, put the spuds on the barge into the down position. [Frazier] said that when he was pulling on a rope to get the barge into position to drop the spuds, he slipped and hurt his back.[
 
 6
 
 ] After the spuds were put into place, [Frazier] and the
 
 *145
 
 co-worker changed out the buckets on land. [Frazier] said he was on the barge for about 35 minutes.
 

 “18. [Frazier’s] work consisted primarily of barge repair and construction and related welding services. [Frazier] testified that in addition to barge construction and repair, there were occasions where he had to maneuver and moor barges. [Frazier] also testified that in his estimation, he spent approximately sixty-five percent of his time working on barges.
 

 “19. [Frazier] claims that he suffered three successive injuries while working for Core, two of which occurred while he was working on or around barges. [Frazier] filed a Longshore and Harbor Workers’ Compensation Act (hereinafter ‘LHWCA’ or ‘longshore’) claim against Pinnacle Management Services relating to the same three accidents that are at issue in this case. [Frazier] recently settled his longshore claim against Pinnacle and is now receiving longshore benefits from Pinnacle.”
 
 [7]
 

 
 *146
 
 The third “accident” referred to in the trial court’s factual findings occurred in March 2005.
 

 In June 2005, Frazier filed a four-count complaint against Core. In count one, styled “Negligence,” Frazier alleged that he was “an able bodied seaman” and that he had been
 

 “injured on or about March 11, 2005, when he attempted to secure and dock by hand a barge to which he had been assigned. While pulling on a dock rope, [Frazier] slipped and fell. As a result of the negligence of [Core] and/or the unseaworthiness of the vessel in question, [Frazier] was caused to suffer injuries and damage[ ] to his back.”
 

 Frazier alleged that he suffered damage in excess of $50,000 as a result of the slip and fall, including lost wages, medical expenses, pain and suffering, and mental anguish.
 

 In count two, Frazier alleged that the foregoing allegations entitled him to recover under the “savings to suitors clause” of the Jones Act, 46 U.S.C. § 688(a), which at all relevant times stated:
 

 “Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply.”
 

 In count three, styled “Seaworthiness,” Frazier alleged that
 

 “[t]he vessel upon which [he] was injured was unseaworthy in that the owner of said vessel failed to insure that proper appurtenances and equipment were attached to said vessel in order to safely dock the same. Inadequate or improperly trained servants were aboard said vessel and made the vessel in question unseaworthy. Servants of the vessel were provided inappropriate or improper procedure and/or policy for safely docking the vessel in question and as a result caused [Frazier’s] injuries and damage[ ].”
 

 We note that “[t]he ‘unseaworthiness’ doctrine is ‘based upon the shipowner’s absolute and nondelegable duty to “furnish a vessel and appurtenances reasonably fit for their intended use.” ’ ”
 
 Ex parte CSX Transp., Inc.,
 
 735 So.2d 476, 480 n. 3 (Ala.1999) (quoting
 
 Szymanski v. Columbia Transp. Co.,
 
 154 F.3d 591, 601 (6th Cir.1998) (Moore, J., dissenting), quoting in turn
 
 Mitchell v. Trawler Racer, Inc.,
 
 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960)). The duty to provide a seaworthy ship is a duty owed seamen, but not employees who are covered under the LHWCA.
 
 See Yamaha Motor Corp., U.S.A. v. Calhoun,
 
 516 U.S. 199, 208 n. 6, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996).
 

 
 *147
 
 In count four, Frazier adopted the allegations contained in the first three counts of his complaint, and he alleged that “[t]he act and/or action of [Core] and/or [the] vessel owner were wanton and/or reckless.” Frazier alleged that he was entitled to punitive damages. We note that it is undisputed that Core owned the vessels on which Frazier worked and on which he was allegedly injured.
 

 Core filed a motion for a summary judgment as to all Frazier’s claims. Core argued that Frazier, “a welder by trade, is not a Jones Act seaman and his work-related tort claims are barred by the exclusivity provisions of the [LHWCA] or the Alabama Workers’ Compensation Act.”
 
 [8]
 
 Frazier filed a brief opposing Core’s motion. Each party submitted excerpts from Frazier’s deposition in support of his or its position; Frazier also submitted certain documentary evidence.
 

 After conducting a hearing on Core’s motion, the trial court entered a judgment in favor of Core and against Frazier as to all Frazier’s claims. The judgment stated:
 

 “Core is entitled to summary judgment for the following reasons: (1) [Frazier] does not meet the test for seaman status under the Jones Act and the claims in his complaint depend upon proof that he is a seaman entitled to protection under the Jones Act; (2) [Frazier’s] claims are barred by the exclusive-remedy provisions in the LHWCA;[
 
 9
 
 ] (3) and, [Frazier] is barred from recovering under 33 U.S.C. § 905(b) of the LHWCA, assuming that such a claim had in fact been pled, because [he] regularly performed ship-building and ship-repair work while working for Core.”
 

 The LHWCA provides that “[t]he liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee.” 33 U.S.C. § 905(a). The LHWCA defines an “employee” as “any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker
 
 including a ship repairman, shipbuilder,
 
 and ship-breaker,
 
 but such term does not include
 
 ... (G) a master or member of a crew of any vessel,” i.e., a seaman under the Jones Act. 33 U.S.C. § 902(3)(emphasis added).
 
 See Stewart v. Dutra Constr. Co.,
 
 543 U.S. 481, 488, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005);
 
 see also Wilson v. Zapata OffShore Co.,
 
 939 F.2d 260, 266 n. 10 (5th Cir.1991) (“The test to determine ‘member of a crew’ status under the [exception to the term ‘employee’ under the] LHWCA is the same as the test for ‘seaman’ status under the Jones Act.”).
 

 Section 905(b) of the LHWCA discusses claims based on an injury “caused by the negligence of a vessel,” and it- provides that the injured party
 

 “may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void....
 
 If such person was employed to provide shipbuilding, repairing, or breaking services and such person’s employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such
 
 
 *148
 

 action shall be permitted, in whole or in part or directly or indirectly, against the injured person’s employer (in any capacity, including as the vessel’s owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer.
 
 The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.”
 

 (Emphasis added.)
 

 Frazier appeals. He argues (1) that based upon the holding in
 
 Chandris, Inc. v. Latsis,
 
 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995), he is a “seaman” for purposes of the Jones Act, and (2) that based upon the holding in
 
 Stewart, supra,
 
 he is “entitled to the benefits provided under the Jones Act pursuant to 33 U.S.C. § 905(b) of the” LHWCA, specifically that he can pursue a negligence claim against Core, as the vessel owner, whether he is deemed a longshoreman or a seaman.
 
 [10]
 

 II. Standard of Review
 

 The standard by which we review a summary judgment is well settled:
 

 “This Court reviews a summary judgment de novo.
 
 Turner v. Westhampton Court, L.L.C.,
 
 903 So.2d 82, 87 (Ala.2004). We seek to determine whether the movant has made a prima facie showing that there exists no genuine issue of material fact and has demonstrated that the movant is entitled to a judgment as a matter of law.
 
 Turner, supra.”
 

 Muller v. Seeds,
 
 919 So.2d 1174, 1176 (Ala.2005).
 
 See
 
 Rule 56(c)(3), Ala. R. Civ. P. As for determining whether a genuine issue of material fact exists, this Court
 

 “must review the record in the light most favorable to the nonmoving party and resolve all reasonable doubts in favor of the nonmovant. The moving party has the burden of making a prima facie showing that he or she is entitled to a summary judgment. If the movant satisfies this burden of production, the nonmovant then bears the burden of producing substantial evidence creating a genuine issue of material fact.”
 

 Rentz v. Grant,
 
 934 So.2d 368, 372 (Ala.2006) (citing
 
 American Gen. Life & Acc. Ins. Co. v. Underwood,
 
 886 So.2d 807, 811 (Ala.2004) (citations omitted)).”
 

 III. Analysis
 

 A. Seaman status
 

 As the Supreme Court noted in
 
 Chan-dris:
 

 “The federal courts have struggled over the years to articulate generally applica
 
 *149
 
 ble criteria to distinguish among the many varieties of maritime workers, often developing detailed multipronged tests for seaman status. Since the 1950’s, this Court largely has left definition of the Jones Act’s scope to the lower courts. Unfortunately, as a result, ‘[t]he perils of the sea, which mariners suffer and shipowners insure against, have met their match in the perils of judicial review.’ Or, as one court paraphrased Diderot in reference to this body of law: ‘ “We have made a labyrinth and got lost in it. We must find our way out.” ’ ”
 

 515 U.S. at 356, 115 S.Ct. 2172 (citations omitted);
 
 see also Puget Sound Freight Lines v. Marshall,
 
 125 F.2d 876, 878 (9th Cir.1942) (a
 
 pre-Chandris
 
 case noting that “[t]he definitions of ‘member of a crew’ [under the LHWCA] and the tests to be applied in determining the status of a worker, as set forth in different opinions, are so many and varied that any attempt at reconciliation would be futile”). Taking into account the statutory and caselaw history that gave rise to the labyrinth, however, and more recent Supreme Court precedents, the resolution of the issue whether Frazier might be a seaman under the Jones Act is clear. He is not.
 

 In
 
 McDermott International, Inc. v. Wilander,
 
 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991), the Supreme Court stated:
 

 “As had the lower federal courts before the Jones Act, this Court continued to construe ‘seaman’ broadly after the Jones Act. In
 
 International Stevedoring Co. v. Haverty,
 
 272 U.S. 50 (1926), the Court held that a stevedore[
 
 11
 
 ] is a ‘seaman’ covered under the Act when engaged in maritime employment. Haverty was a longshore worker injured while stowing freight in the hold of a docked vessel. The Court recognized that ‘as the word is commonly used, stevedores are not “seamen.”’
 
 Id.,
 
 at 52. ‘But words are flexible- We cannot believe that Congress willingly would have allowed the protection to men engaged upon the same maritime duties to vary with the accident of their being employed by a stevedore rather than by the ship.’
 
 Ibid.
 

 “Congress would, and did, however. Within six months of the decision in
 
 Haverty,
 
 Congress passed the Longshore and Harbor Workers’ Compensation Act (LHWCA), 44 Stat. (part 2) 1424, as amended, 33 U.S.C. §§ 901-950. The Act provides recovery for injury to a broad range of land-based maritime workers, but explicitly excludes from its coverage ‘a master or member of a crew of any vessel.’ 33 U.S.C. § 902(3)(G). This Court recognized the distinction, albeit belatedly, in
 
 Swanson v. Marra Brothers, Inc.,
 
 328 U.S. 1 (1946), concluding that the Jones Act and the LHWCA are mutually exclusive. The LHWCA provides relief for land-based maritime workers, and the Jones Act is restricted to ‘a master or member of a crew of any vessel’: ‘We must take it that the effect of these provisions of the [LHWCA] is to confine the benefits of the Jones Act to the members of the crew of a vessel plying in navigable waters and to substitute for the right of recovery recognized by the
 
 Haverty
 
 case only such rights to compensation as are given by the [LHWCA].’
 
 Id.,
 
 at 7. ‘[M]aster or member of a crew’ is a refinement of the term ‘seaman’ in the Jones Act; it excludes from LHWCA coverage those properly covered under the Jones Act. Thus, it is odd but true that the key requirement for Jones Act
 
 *150
 
 coverage now appears in another statute.
 

 “With the passage of the LHWCA, Congress established a clear distinction between land-based and sea-based maritime workers. The latter, who owe their allegiance to a vessel and not solely to a land-based employer, are seamen. Ironically, on the same day that the Court decided
 
 Swanson
 
 it handed down
 
 Seas Shipping Co. v. Sieracki,
 
 328 U.S. 85 (1946). With reasoning remarkably similar to that in
 
 Haverty,
 
 the Court extended to a stevedore the traditional seamen’s remedy of unseaworthiness in those cases where the stevedore ‘is doing a seaman’s work and incurring a seaman’s hazards.’ 328 U.S., at 99. It took Congress a bit longer to react this time. In 1972, Congress amended the LHWCA to bar longshore and harbor workers from recovery for breach of the duty of seaworthiness.
 
 See
 
 86 Stat. 1263, 33 U.S.C. § 905(b);
 
 Miles v. Apex Marine Corp.,
 
 498 U.S. 19, 28 (1990). Whether under the Jones Act or general maritime law, seamen do not include land-based workers.”
 

 498 U.S. at 346-48, 111 S.Ct. 807. The Court continued:
 

 “We now recognize that the LHWCA is one of a pair of mutually exclusive remedial statutes that distinguish between land-based and sea-based maritime employees. The LHWCA restricted the definition of ‘seaman’ in the Jones Act only to the extent that ‘seaman’ had been taken to include land-based employees. There is no indication in the Jones Act, the LHWCA, or elsewhere, that Congress has excluded from Jones Act remedies those traditional seamen who owe allegiance to a vessel at sea....”
 

 498 U.S. at 353-54, 111 S.Ct. 807;
 
 see also Chandris,
 
 515 U.S. at 355, 115 S.Ct. 2172 (“In
 
 Warner [v. Goltra,
 
 293 U.S. 155 (1934) ], we stated that ‘a seaman is a mariner of any degree,
 
 one who lives his life upon the sea.’ Id.,
 
 at 157. Similarly, in
 
 Norton v. Warner Co.,
 
 321 U.S. 565, 572 (1944), we suggested that ‘“every one is entitled to the privilege of a seaman who, like seamen, at all times contributes to the labors about the operation and welfare of the ship
 
 when she is upon a voyage.’”
 
 (quoting
 
 The Buena Ventura,
 
 243 F. 797, 799 (S.D.N.Y.1916)).” (emphasis added)).
 

 In
 
 Chandris,
 
 which the trial court relied upon in its judgment in the present case, the Supreme Court was asked to further clarify what relationship a worker must have to a vessel in navigation in order to qualify for “seaman” status under the Jones Act. 515 U.S. at 350, 115 S.Ct. 2172. As to that issue the
 
 Chandris
 
 Court noted:
 

 “Congress provided some content for the Jones Act requirement in 1927 when it enacted the Longshore and Harbor Workers’ Compensation Act (LHWCA), which provides scheduled compensation (and the exclusive remedy) for injury to a broad range of land-based maritime workers but which also explicitly excludes from its coverage ‘a master or member of a crew of any vessel.’ 44 Stat, (part 2) 1424, as amended, 33 U.S.C. § 902(3)(G).”
 

 515 U.S. at 355, 115 S.Ct. 2172. As noted above, the “land-based” maritime employees to whom Congress directed coverage under the LHWCA include “any longshoreman or other person engaged in long-shoring operations, and any harbor-worker
 
 including a ship repairman, shipbuilder,
 
 and ship-breaker....” 33 U.S.C. § 902(3) (emphasis added).
 

 The
 
 Chandris
 
 Court then “undertook] the ... difficult task of developing a status-based standard that, although it determines Jones Act coverage without regard to the precise activity in which the worker
 
 *151
 
 is engaged at the time of the injury, nevertheless best furthers the Jones Act’s remedial goals.” 515 U.S. at 858, 115 S.Ct. 2172. The Court noted “several basic principles regarding the definition of a seaman. First, ‘[w]hether under the Jones Act or general maritime law,
 
 seamen do not include land-based workers.’ [McDermott Int’l, Inc. v.] Wilander,
 
 [498 U.S. 337] at 348 [(1991)].” 515 U.S. at 358, 115 S.Ct. 2172 (emphasis added). The
 
 Chandris
 
 Court further noted:
 

 “In addition to recognizing a fundamental distinction between land-based and sea-based maritime employees, our cases also emphasize that Jones Act coverage, like the jurisdiction of admiralty over causes of action for maintenance and cure for injuries received in the course of a seaman’s employment, depends ‘not on the place where the injury is inflicted ... but on the nature of the seaman’s service, his status as a member of the vessel, and his relationship as such to the vessel and its operation in navigable waters.’
 
 Swanson [v. Marra Bros., Inc.,
 
 328 U.S. 1, 4 (1946)]. Thus, maritime workers who obtain seaman status do not lose that protection automatically when on shore and may recover under the Jones Act whenever they are injured in the service of a vessel, regardless of whether the injury occurs on or off the ship.”
 

 515 U.S. at 359-60, 115 S.Ct. 2172.
 

 The
 
 Chandris
 
 Court continued:
 

 “Our LHWCA cases also recognize the converse:
 
 Land-based maritime workers injured while on a vessel in navigation remain covered by the LHWCA,
 
 which expressly provides compensation for injuries to certain workers engaged in ‘maritime employment’ that are incurred ‘upon the navigable waters of the United States,’ 33 U.S.C. § 903(a). Thus, in
 
 Director, Office of Workers’ Compensation Programs v. Perini North River Associates,
 
 459 U.S. 297 (1983), we held that a worker injured while ‘working on a barge in actual navigable waters’ of the Hudson River,
 
 id.,
 
 at 300, n. 4, could be compensated under the LHWCA,
 
 id.,
 
 at 324. See also
 
 Parker v. Motor Boat Sales, Inc.,
 
 314 U.S. 244, 244-245 (1941) (upholding LHWCA coverage for a worker testing outboard motors who “was drowned when a motor boat in which he was riding capsized’). These decisions, which reflect our longstanding view of the LHWCA’s scope, indicate that a maritime worker does not become a ‘member of a crew’ as soon as a vessel leaves the dock.
 

 “It is therefore well settled after decades of judicial interpretation that the Jones Act inquiry is fundamentally status based:
 
 Land-based maritime workers do not become seamen because they happen to be working on board a vessel when they are injured,
 
 and seamen do not lose Jones Act protection when the course of their service to a vessel takes them ashore. In spite of this background, respondent and Justice STEVENS suggest that any maritime worker who is assigned to a vessel for the duration of a voyage — and whose duties contribute to the vessel’s mission— should be classified as a seaman for purposes of injuries incurred during that voyage. See Brief for Respondent 14;
 
 post,
 
 at 2194 (opinion concurring in judgment). Under such a ‘voyage test,’ which relies principally upon this Court’s statements that the Jones Act was designed to protect maritime workers who are exposed to the ‘special hazards’ and ‘particular perils’ characteristic of work on vessels at sea, see,
 
 e.g., [McDermott Int’l, Inc. v.] Wilander,
 
 [498 U.S. 337] at 354 [(1991)], the worker’s activities at the time of the injury would be controlling.
 

 
 *152
 
 “The difficulty with respondent’s argument, as the foregoing discussion makes clear, is that the LHWCA repudiated the
 
 [International Stevedoring Co. v.] Haverty[,
 
 272 U.S. 50 (1926),] line of eases and established that a worker is no longer considered to be a seaman simply because he is doing a seaman’s work at the time of the injury.
 
 Seaman status is not coextensive with seamen’s risks.
 

 [[Image here]]
 

 “... In evaluating the employment-related connection of a maritime worker to a vessel in navigation, courts should not employ ‘a “snapshot” test for seaman status, inspecting only the situation as it exists at the instant of injury; a more enduring relationship is contemplated in the jurisprudence.’
 
 Easley [v. Southern Shipbuilding Corp.,
 
 965 F.2d 1, 5 (5th Cir.1992)]. Thus, a worker may not oscillate back and forth between Jones Act coverage and other remedies depending on the activity in which the worker was engaged while injured.
 
 Reeves v. Mobile Dredging & Pumping Co.,
 
 26 F.3d 1247, 1256 (C.A.3 1994). Unlike Justice STEVENS, see
 
 post,
 
 at 2194,
 
 we do not believe that any maritime worker on a ship at sea as part of his employment is automatically a member of the crew of the vessel within the meaning of the statutory terms. Our rejection of the voyage test is also consistent with the interests of employers and mantime workers alike in being able to predict who will be covered by the Jones Act (and, perhaps more importantly for purposes of the employers’ workers’ compensation obligations, who will be covered by the LHWCA) before a particular workday begins.
 

 “To say that our cases have recognized a distinction between land-based and sea-based maritime workers that precludes application of a voyage test for seaman status, however, is not to say that a maritime employee must work
 
 only
 
 on board a vessel to qualify as a seaman under the Jones Act. In
 
 Southwest Marine, Inc. v. Gizoni,
 
 502 U.S. 81 (1991), decided only a few months after
 
 Wilander,
 
 we concluded that a worker’s status as a ship repairman, one of the enumerated occupations encompassed within the term ‘employee’ under the LHWCA, 33 U.S.C. § 902(3), did not necessarily restrict the worker to a remedy under that statute. We explained that, ‘[w]hile in some cases a ship repairman may lack the requisite connection to a vessel in navigation to qualify for seaman status, ... not all ship repairmen lack the requisite connection as a matter of law. This is so because “[i]t is not the employee’s particular job that is determinative, but the employee’s connection to a vessel.” ’
 
 Gizoni, supra,
 
 at 89 (quoting
 
 Wilander,
 
 498 U.S., at 354) (footnote omitted). Thus, we concluded, the Jones Act remedy may be available to maritime workers who are employed by a shipyard and who spend a portion of their time working on shore but
 
 spend the rest of their time at sea.”
 

 515 U.S. at 360-64, 115 S.Ct. 2172 (emphasis added).
 

 With the foregoing basic principles established, the
 
 Chandris
 
 Court then articulated the following two-part test for determining whether a particular employee is a seaman:
 

 “[T]he essential requirements for seaman status are twofold. First, as we emphasized in
 
 [McDermott Int’l, Inc. v.] Wilander,
 
 [498 U.S. 337 (1991),] ‘an employee’s duties must “contribut[e] to the function of the vessel or to the accomplishment of its mission.” ’ 498 U.S., at 355 (quoting
 
 [Offshore Co. v.] Robison,
 
 266 F.2d [769], 779 [(5th Cir.1959)]).
 
 *153
 
 The Jones Act’s protections, like the other admiralty protections for seamen, only extend to those maritime employees who do the ship’s work. But this threshold requirement is very broad: ‘All who work at sea in the service of a ship’ are
 
 eligible
 
 for seaman status. 498 U.S., at 354.
 

 “Second, and most important for our purposes here,
 
 a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature.
 
 The
 
 fundamental purpose
 
 of this substantial connection requirement is to give .full effect to the remedial scheme created by Congress and
 
 to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea.”
 

 515 U.S. at 368, 115 S.Ct. 2172 (emphasis added).
 
 [12]
 

 Further, commenting on the “temporal” aspect (duration) of a maritime employee’s connection to a vessel in navigation, the
 
 Chandris
 
 Court stated:
 

 “Generally, the Fifth Circuit seems to have identified an appropriate rule of thumb for the ordinary case: A worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act. This figure of course serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases. As we have said, ‘[t]he inquiry into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee’s precise relation to it.’
 
 [McDermott Int’l, Inc. v.] Wilander,
 
 498 U.S. [337], at 356 [(1991)].”
 

 515 U.S. at 371, 115 S.Ct. 2172. The Court concluded: “[T]he Jones Act was intended to protect sea-based maritime workers, who owe their allegiance to a vessel, and not land-based employees, who do not.”
 
 Id.
 
 at 376, 115 S.Ct. 2172.
 

 In the present case, the trial court concluded that a genuine issue of material fact existed as to whether Frazier satisfied the first element of the
 
 Chandris
 
 test.
 
 [13]
 
 As to
 
 *154
 
 the second element, however, the trial court determined that Frazier
 

 “performed the bulk of his work either on land or on spud barges that were almost always spudded down and tied off. [Frazier’s] connection to a vessel in navigation, if any, was sporadic and extremely short in duration, not substantial in duration or nature. [Frazier] was not ‘exposed to the perils of the sea’ as required by
 
 Chandris.
 

 [[Image here]]
 

 “Here, [Frazier] was not a sea-based maritime employee whose duties regularly took him to sea. Instead, [Frazier] arrived at work every day by vehicle and went home every night to sleep in his own bed. [Frazier] did not take his meals on the boat and did not sleep on the boat. [Frazier] was not a member of the crews that regularly offloaded the barges and was not paid like them. He regularly did welding work on items that were on the land while he was on land. His base of operation was a mechanic shop on land. The work that [Frazier] did on a barge was almost always done while the barge was moored, spudded down, or completely out of operation. He was never on a vessel in navigation while working for Core, and the only time he was on a barge that was moving was when the barge was being moved short distances along the shoreline by a crane. These ‘trips’ were infrequent and generally took between thirty minutes and an hour. The work that he actually did while he was on a barge, with the exception of occasionally handling lines, was done there only because the item that he was repairing was located on the vessel.”
 

 Based on its judgment, the trial court appears to have concluded (1) that Frazier did not work on barges that were “in navigation” and (2) that Frazier’s connection to barges “in navigation” was not “substantial in duration and nature” for purposes of the Jones Act. As to the issue of when a vessel is considered “in navigation,” the
 
 Chandris
 
 Court stated:
 

 “Under our precedent and the law prevailing in the Circuits, it is generally accepted that ‘a vessel does not cease to be a vessel when she is not voyaging, but is at anchor, berthed, or at dockside,’
 
 DiGiovanni v. Traylor Bros., Inc.,
 
 959 F.2d 1119, 1121(CA1) (en banc),
 
 cert. denied,
 
 506 U.S. 827 (1992), even when the vessel is undergoing repairs. See ... [2 M. Norris,
 
 Law of Seamen
 
 § 30.13,] at 364 [(4th ed. 1985)] (‘[A] vessel is in navigation ... when it returns from a voyage and is taken to a drydock or shipyard to undergo repairs in preparation to making another trip, and likewise a vessel is in navigation, although moored to a dock, if it remains in readiness for another voyage’ (footnotes omitted)). At some point, however, repairs become sufficiently significant that the vessel can no longer be considered in navigation. In
 
 West v. United States, 361 U.S.
 
 118 (1959), we held that a shoreside worker was not entitled to recover for unseaworthiness because the vessel on which he was injured was undergoing an overhaul for the purpose of making her seaworthy and therefore had been withdrawn from navigation. We explained that, in such cases, ‘the focus should be upon the status of the ship, the pattern of the
 
 *155
 
 repairs, and the extensive nature of the work contracted to be done.’
 
 Id.,
 
 at 122.... The general rule among the Courts of Appeals is that vessels undergoing repairs or spending a relatively short period of time in drydock are still considered to be ‘in navigation’ whereas ships being transformed through ‘major’ overhauls or renovations are not.”
 

 515 U.S.
 
 at 373-74, 115 S.Ct. 2172.
 

 In light of the foregoing language from
 
 Chandris,
 
 the barge on which Frazier was injured in March 2005 arguably had not been taken out of service and was “in navigation” for purposes of the Jones Act. The same argument can be made as to most of Frazier’s other work on Core’s barges, which involved barges that might be considered “in navigation” for purposes of the Jones Act. We pretermit consideration, however, of whether the trial court erred when it concluded that Frazier “was never on a vessel in navigation while working for Core.” As hereinafter discussed, Frazier’s Jones Act claims fail because the trial court was correct in its determination that no genuine issue exists as to whether Frazier’s relationship to vessels in navigation was substantial in nature for purposes of the Jones Act.
 

 As the
 
 Chandris
 
 Court noted:
 

 “[T]he question of who is a ‘member of a crew,’ and therefore who is a ‘seaman,’ is a mixed question of law and fact. Because statutory terms are at issue, their interpretation is a question of law and- it is the court’s duty to define the appropriate standard.
 
 [McDermott Int’l, Inc. v.] Wilander,
 
 498 U.S. [337] at 356 [(1991)]. On the other hand, ‘[i]f reasonable persons,- applying the proper legal standard, could differ as to whether the employee was a “member of a crew,” it is a question for the jury.’
 
 Ibid.
 
 .... The jury should be permitted, when determining whether a maritime employee has the requisite employment-related connection to a vessel in navigation to qualify as a member of the vessel’s crew, to consider all relevant circumstances bearing on the two elements outlined above.”
 

 515 U.S. at 369, 115 S.Ct. 2172. The Court continued:
 

 “In our view, ‘the
 
 total circumstances
 
 of an individual’s employment must be weighed
 
 to determine whether he had a sufficient relation to the navigation of vessels and the perils attendant thereon.’ Wallace v. Oceaneering Int’l,
 
 727 F.2d 427, 432 (C.A.5 1984). The duration of a worker’s connection to a vessel and
 
 the nature of the worker’s activities,
 
 taken together, determine whether a maritime employee is a seaman because the ultimate inquiry is whether the worker in question is a member of the vessel’s crew or
 
 simply a land-based employee who happens to be working on the vessel at a given time.”
 

 515 U.S. at 370, 115 S.Ct. 2172 (emphasis added).
 

 Although Frazier’s argument parrots the language of
 
 Chandris
 
 so that superficially there appears to be merit in his contention that he had a connection to Core’s barges that was substantial in nature for purposes of the Jones Act, his argument is at odds with the fundamental purpose of the “substantial connection” requirement. As the
 
 Chandris
 
 Court stated:
 

 “The fundamental purpose of this substantial connection requirement
 
 is ... to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers
 
 ...
 
 whose employment does not regularly expose them to the perils of the sea.”
 

 515 U.S. at 368, 115 S.Ct. 2172 (emphasis added).
 

 
 *156
 
 Perhaps more importantly, subsequent to its decision in
 
 Chandris,
 
 the Supreme Court stated:
 

 “For the substantial connection requirement to serve its purpose, the inquiry into
 
 the nature
 
 of the employee’.s connection to the vessel must concentrate on
 
 whether the employee’s duties „take, him to sea. This will give substance to the inquiry both as to the duration and nature of the employee’s connection to the vessel and be helpful in distinguishing land-based from sea-based employees.”
 

 Harbor Tug & Barge Co. v. Papai,
 
 520 U.S. 548, 555, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997).
 

 In
 
 Papai
 
 the Court held that Papai did not meet the test for seaman status, noting:
 

 “Papai was qualified under the IBU [Inland Boatman’s Union] Deckhands Agreement to perform non-seagoing work in addition to the seagoing duties described above. His actual duty on the
 
 Pt. Barrow
 
 throughout the employment in question did not include any seagoing activity;
 
 he was hired for one day to paint the vessel at dockside and he was not going to sail with the vessel after he finished painting it.
 
 This is not a case where the employee was hired
 
 to perform seagoing work
 
 during the employment in question, however brief, and we need not consider here the consequences of such an employment. The IBU Deckhands Agreement gives no reason to assume that any particular percentage of Papai’s work would be of a seagoing nature, subjecting him to the perils of the sea. In these circumstances, the union agreement does not advance the accuracy of the seaman-status inquiry.
 

 “Papai argues he qualifies as a seaman if we consider his 12 prior employments with Harbor Tug over the 2½ months before his injury. Papai testified at his deposition that he worked aboard the
 
 Pt. Barrow
 
 on three or four occasions before the day he was injured, the most recent of which was more than a week earlier.
 
 Each of these engagements involved only maintenance work while the tug was docked.
 
 The nature of Papai’s connection to the
 
 Pt. Barrow
 
 was no more substantial for seaman-status purposes by virtue of these engagements than the one during which he was injured. Papai does not identify with specificity what he did for Harbor Tug the other eight or nine times he worked for the company in the 2 ½ months before his injury.
 
 The closest he comes is his deposition testimony that 70 percent of his work over the 2 1/h years before his injury was deckhand work. Coupled with the fact that none of Papai’s work aboard the
 
 Pt. Barrow
 
 was of a seagoing nature, it would not be reasonable to infer from Papai’s testimony that his recent engagements with Harbor Tug involved work of a seagoing nature.
 
 In any event, these discrete engagements were separate from the .one in question, which was the sort of ‘transitory or sporadic’ connection to a. vessel or group of vessels that, as we explained in
 
 Chandris,
 
 does not qualify one for seaman status. 515 U.S., at 368.”
 

 520 U.S. at 559-60, 117 S.Ct. 1535 (references to record omitted; emphasis added).
 

 Based on the rationale behind the “substantial in nature” requirement announced in
 
 Chandris
 
 and on the interpretation and application of that language in
 
 Papai
 
 we are clear to the conclusion that the trial court did not err when it determined that no genuine issue of material fact existed as to whether Frazier’s connection to Core’s barges was substantial in nature. Frazier was a land-based employee whose work
 
 *157
 
 was not of a seagoing nature; he was not “regularly exposed to the perils of the sea” while performing his work for Core.
 
 Compare, e.g., Richard v. Mike Hooks, Inc.,
 
 799 So.2d 462, 466-67 (La.2001) (“Richard’s time spent aboard Hooks’s vessels and the perils he faced must be considered along with other important facts to determine whether his connection[s] with defendant’s vessels are substantial in nature and duration. In this particular instance, we consider an analysis of the following: all of the vessels on which plaintiff worked were dockside; he was never more than a gangplank’s distance from shore when working on the vessels; some of the vessels were partially on land while being repaired; he never slept on the vessels; he did not eat on the vessels; he did not keep watch on vessels overnight; he was not a member of Hooks’s dredge crew that performed welding on dredges in operation; he never worked on a vessel while it was performing its primary mission; he took his orders from a land-based foreman; he was only aboard small moving vessels once every month, for short durations, where he assisted in moving dredge pipe along a canal adjacent to Hooks’s yard; and his repair duties did not take him to sea. While none of these individual facts alone prohibit an employee from attaining seaman status, a consideration of them together shows that Richard was a land-based employee, not a seaman.” (footnote omitted)).
 

 Further, the LHWCA specifically defines an “employee” for purposes of that act as “any person engaged in maritime employment, including any
 
 longshoreman
 
 or other person engaged in longshoring operations, and any harbor-worker including a
 
 ship repairman, shipbuilder,
 
 and ship-breaker.” 38 U.S.C. § 902(3)(emphasis added). The trial court found that Frazier was a ship repairman and, though he testified that he acted as a “deckhand” on occasion, the only specific testimony he gives concerning what he did as a “deckhand” related to his occasionally assisting with matters related to the loading and unloading of the barges at dockside. In fact, Frazier conceded that so far as his work was concerned, the barges essentially served as work platforms. There is. no evidence indicating that he performed the duties of a “deckhand” away from the dock on open water, i.e., “duties that [took] him to sea” where the barges were being pushed by tugboat to transport cargo.
 
 See Papai,
 
 520 U.S. at 555, 117 S.Ct. 1535. Under these circumstances, if Frazier is a seaman for purposes of the Jones Act, then virtually all longshoremen, who typically work on ship during the loading and unloading process,
 
 see Northeast Marine Terminal Co. v. Caputo,
 
 432 U.S. 249, 254 n. 4, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977), could be classified as a seamen as well. Such an expansive view of seaman status would virtually eliminate the distinction Congress has drawn between the types of employees who are “engage[d] in maritime employment,” as illustrated in § 902(3), and those employees who are “member[s] of a crew of any vessel.”
 
 See, e.g., Roberts v. Ingram Barge Co.,
 
 [No. 5:06-CV-00210-R, April 16, 2009] (W.D.Ky.2009) (not reported in F.Supp.2d) (stating in regard to a welder who “spent all of his workday either in the fleets or performing repair work on barges that were moored alongside the dock”: “The hazards Roberts states he faced do not rise to the level of the special hazards and disadvantages faced by seaman; they are hazards that longshoremen commonly encounter. Therefore, Roberts was an intended beneficiary of the LHWCA.”). Perhaps more importantly, such an expansive view of seaman status would remove the safe harbor of the LHWCA’s no-fault maritime-workers’ compensation scheme for many persons who are “engaged in maritime em
 
 *158
 
 ployment,” leaving them
 
 to
 
 navigate through the tort-based schemes the LHWCA was intended to displace.
 
 [14]
 

 Considering the totality of the evidentiary materials presented to the trial court, we cannot conclude that reasonable jurors could differ as to whether Frazier’s connection to a vessel in navigation was substantial in nature for purposes of the Jones Act. Accordingly, Frazier’s negligence claim (count 1), which he based on his status as an “able-bodied seaman,” fails. Likewise, his Jones Act claim (count 2) and his unseaworthiness claim (count 3) fail. As for Frazier’s claims based on Core’s alleged wanton or reckless action (count 4), Frazier makes no specific argument addressing the denial of this “claim,” and he cites no authority that would support’ a ruling that the trial court erred by denying this “claim.” Thus, any argument relating to that count is waived.
 
 Chunn v. Whisenant,
 
 877 So.2d 595, 601 (Ala.2003).
 

 B. Section 905(b)
 

 Frazier’s remaining argument is that even if he is an employee under the LHWCA instead of a seaman for purposes of his Jones Act claims, he is entitled to maintain a negligence action against Core under the § 905(b) exception to exclusive liability found in § 905(a) of the LHWCA. Section 905(b) states:
 

 “In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.... If such person was employed to provide
 
 shipbuilding, repairing,
 
 or breaking services
 
 and
 
 such person’s employer was
 
 the owner,
 
 owner pro hac vice, agent, operator, or charterer of the vessel,
 
 no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person’s employer (in any capacity, including as the vessel’s owner,
 
 owner pro hac vice, agent, operator, or charterer) or against the employees of the employer. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of
 
 *159
 
 all other remedies against the vessel except remedies available under this chapter.”
 

 33 U.S.C. § 905(b)(emphasis added).
 

 The trial court noted in its judgment that
 

 “[Frazier’s] counsel argued in his opposition brief and at the hearing that [Frazier] has a valid claim under 33 U.S.C. § 905(b) of the LHWCA. This claim was not pled in [Frazier’s] Complaint and is not properly before the Court.”
 

 Frazier does not argue or provide authority to support an argument that the trial court erred when it concluded that he had not pleaded a claim under § 905(b) and that such a claim was not properly before the court. Thus, he has waived any such argument and we need not consider it further.
 
 See Chunn, supra.
 

 [15]
 

 IV. Conclusion
 

 Based on the foregoing, we affirm the summary judgment.
 

 AFFIRMED.
 

 COBB, C.J., and LYONS, STUART, and BOLIN, JJ., concur.
 

 [1]
 

 . In 2006, the Jones Act was amended and renumbered as 46 U.S.C. § 30104.
 

 [2]
 

 . “The Jones Act provides tort remedies to sea-based maritime workers, while the LHWCA provides workers' compensation to land-based maritime employees.”
 
 Stewart v. Dutra Constr. Co.,
 
 543 U.S. 481, 488, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005). “The LHWCA and the Jones Act are ‘mutually exclusive’ ” compensation schemes.
 
 Harbor Tug & Barge Co. v. Papai,
 
 520 U.S. 548, 553, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997).
 

 [3]
 

 . Spuds are vertical steel shafts that can be lowered from a barge to hold it in place.
 

 [4]
 

 . According to the trial court’s order, "[a] hopper is reported to be a funnel-shaped receptacle for delivering material such as grain or coal.”
 

 [5]
 

 . Frazier made approximately 40 '‘trips” on Core barges that were pulling themselves along the shoreline using a crane during his approximately 18 months of employment with Core. These "trips” lasted between 30 minutes and an hour each.
 

 [6]
 

 . Frazier and the coworker were attempting to pull the barge up against a dock and were a few feet from the dock when Frazier slipped.
 

 [7]
 

 . The record on appeal contains a letter from an attorney for Pinnacle Management Services concerning Frazier’s LHWCA claim against Pinnacle. In the letter, Pinnacle confirmed that it was initiating the payment of benefits to Frazier under the LHWCA and that it was agreeing for the matter to be "remanded from the Administrative Law Judge back to the [United States] Department of Labor.” In his appellate brief, Frazier refers to this letter as the agreement whereby Pinnacle accepted his LHWCA claim. Frazier states that "[t]he agreement was later memorialized in a Court order by Judge Lee Romero, of the Office of Administrative Law Judges, after the notice of appeal [in the present case] was filed.” (Frazier’s brief, at 14.) In another part of his brief, Frazier states that LHWCA ”[b]enefits were awarded and [he] is currently receiving the same.” (Frazier’s brief, at 11.)
 

 The payment of benefits under the LHWCA does not preclude a person from filing a claim under the Jones Act.
 

 “It is by now ‘universally accepted’ that an employee who receives voluntary payments under the LHWCA
 
 without a formal award
 
 is not barred from subsequently seeking relief under the Jones Act. This is so, quite obviously, because the question of coverage has never actually been litigated. The LHWCA clearly does not comprehend such a preclusive effect, as it specifically provides that any amounts paid to an employee for the same injury, disability, or death pursuant to the Jones Act shall be credited against any liability imposed by the LHWCA.”
 

 Southwest Marine, Inc. v. Gizoni,
 
 502 U.S. 81, 91-92, 112 S.Ct. 486, 116 L.Ed.2d 405 (1991) (citations omitted; emphasis added);
 
 see also
 
 33 U.S.C. § 914(a) (providing for the payment of compensation under the LHWCA "without an award, except where liability to pay compensation is controverted by the employer”); 33 U.S.C. § 933(b) (”[T]he term ‘award’ with respect to a compensation order means a formal order issued by the deputy commissioner, an administrative law judge, or [the Benefits Review] Board.”); and 33 U.S.C. § 919(e)(noting that a "compensation order” is "[t]he order rejecting the claim or making the award”).
 

 There is disagreement among the federal circuits whether a party may pursue a Jones Act claim after a “formal” award of benefits under the LHWCA.
 
 Compare Figueroa v. Campbell Indus.,
 
 45 F.3d 311, 315 (9th Cir.1995) (noting that, although the LHWCA and the Jones Act "are ‘mutually exclusive,’ some maritime workers may be Jones Act seamen who are injured while also performing a job specifically enumerated under the LHWCA, and, therefore, are entitled to recovery under both statutes, although double recovery of any damage element is precluded”),
 
 with Sharp v. Johnson Bros. Corp.,
 
 973 F.2d 423, 426-27 (5th Cir.1992) ("The LHWCA was not designed to create a mere safety net, guaranteeing workers a minimum award as they seek greater rewards in court. Rather, it has a benefit to employers, too, giving them limited and predictable liability in exchange for their giving up their ability to defend tort actions. Permitting a Jones Act proceeding after a formal compensation award here would defeat the purpose of the LHWCA, as well as work unfairness, because, as here, employers often have different insurance carriers for workers' compensation claims and tort
 
 *146
 
 claims, so the compensation insurer, by guaranteeing a minimum award, necessarily would reduce the ability of the tort insurer to effect a settlement." (citations omitted)).
 

 Although Frazier’s brief refers to an order from the administrative law judge "memorializing” his agreement with Pinnacle and although he states that benefits have been "awarded” to him, the record on appeal does not contain the order or orders reflecting these events, which occurred after Frazier filed his notice of appeal in the present case. Thus, we are not privy to the terms of the order or orders, and, in particular, we have no information concerning whether the "award” was conditional or otherwise made reference to the present case. Further, Core has not argued in its appellate brief that the "award” of benefits to Frazier renders his claims moot. Because we cannot conclude based on the state of the record and the arguments before us that Frazier has received a formal award of LHWCA benefits, we need not, and indeed cannot, address whether such an award would moot his claims against Core.
 

 [8]
 

 .
 
 See
 
 Ala.Code 1975, § 25-5-1 et seq.
 

 [9]
 

 . The trial court concluded that Core was Frazier’s "borrowing employer” for purposes of the LHWCA,
 
 see Cooks v. Bender Shipbuilding & Repair Co.,
 
 833 So.2d 631 (Ala.Civ.App.2001), and that Frazier was an LHWCA employee, not a Jones Act seaman. Thus, Frazier’s claims were subject to the exclusive-remedy provisions set forth in 33 U.S.C. § 905(a).
 

 [10]
 

 . Core argues in its appellate brief that Frazier conceded at the hearing on its summary-judgment motion that he "was a longshoreman, not a Jones Act seaman.” (Core’s brief, at 14.) As Core notes, however, there is no transcript of the hearing. Frazier contends in his reply brief on appeal that he claimed that he was a seaman, but he also argued that even if he was a longshoreman he could still pursue a claim against Core under 33 U.S.C. § 905(b).
 

 Core argues that the trial court's judgment "specifically acknowledges and memorializes [Frazier's] concession.” (Core’s brief, at 14.) Although the trial court noted in its judgment that Frazier conceded that he was a longshoreman who was receiving LHWCA benefits, this statement appears after its detailed findings of fact and analysis of the issue whether Frazier qualified for seaman status. The judgment does not support the conclusion that Frazier conceded he was
 
 only
 
 a longshoreman and that he could not qualify for seaman status; such a concession would have rendered unnecessary most of the trial court's extensive findings of fact and its discussion of why Frazier was not a seaman.
 

 [11]
 

 . A stevedore is one employed in the loading and unloading of ships.
 

 [12]
 

 . In his reply brief, Frazier relies on a quote from
 
 Chandris
 
 that is quoting a similar two-part test articulated by the United States Court of Appeals for the Fifth Circuit in
 
 Offshore Co. v. Robison,
 
 266 F.2d 769, 779 (5th Cir.1959). 515 U.S. at 366, 115 S.Ct. 2172. Frazier does not attribute the quote to
 
 Robi-son,
 
 however, and he apparently does not apprehend that element one of the
 
 Robison
 
 test is similar to element two of the
 
 Chandris
 
 test and that element two of the
 
 Robison
 
 test is similar to element one of the
 
 Chandris
 
 test. This is important because Frazier’s argument from the
 
 Robison
 
 test emphasizes what is essentially the first element of the test announced in
 
 Chandris. As
 
 discussed
 
 infra
 
 in this opinion, however, the trial court specifically found that an issue of material fact existed as to whether element one from
 
 Chandris
 
 was satisfied; a finding Core does not dispute. The issue that we must decide is whether the trial court erred when it concluded that there was no genuine issue regarding Frazier’s failure to satisfy element two of the
 
 Chandris
 
 test.
 

 [13]
 

 . The trial court stated, that the “ ‘contribute to the function of the vessel’ prong has been given broad construction by the courts and the Court believes that there is at least an issue of fact as to whether [Frazier’s] work contributed to the function of Core’s barges and offloading operation.” Core does not dispute the trial court’s conclusion that an issue of material facts exists concerning whether Frazier “contributed to the function of a vessel” for purposes of the Jones Act.
 
 See, e.g., Cook v. Belden Concrete Prods., Inc.,
 
 472 F.2d 999, 1001-02 (5th Cir.1973) (“Conventional ships and barges ... which are de
 
 *154
 
 signed for navigation and commerce are vessels within general maritime and Jones Act jurisdiction and retain such status even while moored, dry-docked, or otherwise immobilized and secured to land.”);
 
 see also Stewart,
 
 543 U.S. at 488-95, 125 S.Ct. 1118;
 
 Holmes v. Atlantic Sounding Co., 437
 
 F.3d 441, 448 (5th Cir.2006); and
 
 Allen v. Mobile Interstate Piledrivers,
 
 475 So.2d 530 (Ala.1985).
 

 [14]
 

 . Frazier relies upon
 
 Stewart,
 
 which involved consideration of the meaning of the § 902(3)(G) exception (“a master or member of a crew of any vessel”).
 
 Stewart,
 
 however, does not address the issue of what connection to a vessel in navigation is necessary for the connection to be considered “substantial in duration and nature.”
 
 See
 
 543 U.S. at 488, 125 S.Ct. 1118 (“We began clarifying the definition of 'seaman’ in a pair of cases,
 
 McDermott Int’l Inc.
 
 v.
 
 Wilander, supra,
 
 and
 
 Chandris, supra,
 
 that addressed the relationship a worker must have to a vessel in order to be a 'master of member’ of its crew. We now turn to the other half of the LHWCA’s equation: how to determine whether a watercraft is a 'vessel.’ ”). In fact, on remand from
 
 Stewart,
 
 when the employer attempted to raise the substantial-duration-and-nature issue, the United States Court of Appeals for the First Circuit noted that the employer already had conceded the issue in prior proceedings and that it was therefore precluded from raising it.
 
 Stewart,
 
 418 F.3d at 35-36. In any event, the employee in
 
 Stewart
 
 was “a marine engineer” who was hired to maintain the mechanical systems on a large dredge and who spent 99% of his time onboard while the dredge was performing its dredging operations in Boston Harbor. By contrast, Frazier offered no evidence indicating that he worked on Core’s barges away from the shoreline while they were actually performing their work of transporting cargo, where he might have been "regularly exposed to the perils of the sea.”
 

 [15]
 

 . Frazier did not refer to § 905(b) in his complaint against Core; he did not name the vessel as a party to his action; and he did not claim that he was filing his claims in the alternative (i.e., as a seaman and/or as an employee under the LHWCA). Frazier does not argue that the first claim in his complaint might be construed as asserting a claim under § 905(b). Nevertheless, the trial court went on to state that, even if Frazier's complaint can be read as alleging a claim under § 905(b), "Core would still be entitled to summary judgment because [Frazier] regularly performed ship-building and ship-repair work for Core and is therefore barred from recovering under § 905(b) pursuant to the express provisions of that section.”